Good morning, Your Honors. My name is Richard Lorenz, and I'm representing the Clatskanie People's Utility District in this matter. With me today is Mr. Don Brookhiser, who is representing intervener Georgia Pacific. Mr. Brookhiser has asked that I reserve a few minutes, which I will do. And I'm also going to ask for five minutes, actually less than that, two minutes' time for rebuttal. Counsel, I think the thing that is most troubling to me, it seems to me that you should have gotten to the stage where you set the rates, and then the case would clearly be ripe. But at this point, it seems to me there's still some missing things that need to take place before we take jurisdiction and look at this case. Thank you for raising that question right up front. And so I'll tell you why I think that this case is right. The reason is that there is a difference between challenging one of Bonneville's rates and challenging one of Bonneville's rate methodologies. And I think until now, and it's my obligation now to disentangle the two. Well, now, the first go-round, that's what you tried to do, and you were told it wasn't So you went back and have gotten the blessing of the commission or whatever it is. Does that change it? So in terms of challenging a rate methodology, I believe that what has happened since the last petition we filed was that the Federal Energy Regulatory Commission has issued an order approving Bonneville's rate methodology. And there's a line of cases, some of which are actually cited by this Court in the previous decision, that all say that a petitioner may in fact challenge a rate methodology once it has been approved by the Federal Regulatory Energy Commission, even before Bonneville has taken action to set rates under that rate methodology. So what may be helpful to understand is exactly what process Bonneville goes through to set rates. What we have is a methodology that they've adopted that's intended to guide them for at least the next 20, I believe, 20 years. And they're going to set rates using that methodology every two years. And the legal flaw that we've identified is not in how they're going to calculate rates. It's not in how they're going to crunch the numbers and come out with a rate that we're required to pay. The legal flaw is that the methodology itself impermissibly alters the allocation of Federal-based system power that was established in the Northwest Power Act. And the way that it impermissibly alters that balance of Federal-based system benefits is that it strips, in our case, it strips us of 40 megawatts of what's called CFCT load that we haven't yet purchased but would have the right to purchase in the future. Now, in our view, Bonneville has, through its new rate methodology, essentially established a deadline. October 1, 2010, they say, you must have purchased your entire allotment of CFCT power. And I'll explain what that is, because I realize that may be a ---- So I think you're in the right track, and to make sure that we're stating this precisely, what Bonneville has done in the tiered rate methodology has said, from now on, this hasn't been the case in the past, but from now on, there will be two tiers of rates. And again, we're not saying that what those rates actually end up being is wrong, but there will be two tiers of rates. And they're saying, if you haven't exercised your right to the CFCT power, you will no longer get the first tier of rate, which is the equivalent of the Federal-based system power. You will only get the second tier of rate, and the second tier of rate is incremental market purchases that BPA will make to augment the Federal-based system. So the purpose of the Northwest Power Act, and the reason that we're here, is because Congress directed BPA to allocate the benefits of the Federal-based system to certain competing customer groups. And there's a very helpful summary of this in the Supreme Court's Alcoa case from 1984, and it describes in fair detail what was happening and what generated this act. Congress directed BPA, Bonneville, to allocate the benefits of the Federal-based system to four customer classes. The first is obviously the preference customers, by reaffirming their preference and priority that was longstanding. The second was the residential and small farm customers of the investor-owned utilities in the region. The third was the aluminum industry in the finite period of time. And the fourth was for the forest products industries, the wood and paper mills in the Pacific Northwest, most of whom were located in the service territory of preference customer utilities, just exactly like Georgia Pacific's Wanamill is in Klatske and Isurus Territory. What Congress did was ensure that they had continued access to this Federal-based system through this CFCT designation. And what the CFCT means is Congress looked at these facilities, these mills, and it recognized that at the time the act was passed, they already had contractual commitments in place with their serving utilities that gave them access to the Federal-based system. And Congress specifically wrote the contracted for and committed to language into Section 313A of the Northwest Power Act in order to ensure that nothing in the act would act to preclude them from continued access to this Federal-based system power based on these preexisting contractual commitments. And this was, in our view and in BPA's interpretation, in fact, for the last 30 years up until October 1, 2010, this was always regarded as an allocation of Federal-based system power to these particular designated loads. So in our view, what happened in the tiered rate methodology was Bonneville set a deadline and they said, look, you haven't used this power yet. The amount of power that currently so let me back up a step. The Wanamill has an official CFCT designated load of 126.9 megawatts. That was established by Bonneville pursuant to the act. The mill currently uses 85 megawatts pursuant to that designation. That leaves them the option and the opportunity in the future to purchase 40 additional megawatts of this Federal-based system power. This is an incredibly valuable resource for the utility, for the mill that it serves, and in fact, for the whole community that's built up around this mill. So what happened with this deadline imposed by Bonneville, this arbitrary deadline, was they said, you've gotten Federal- based system up until now. We are not going to hold that open to you anymore. From now on, you are only getting this tier 2 market purchase power to serve that load. So the problem that we have with this treatment of the CFCT loads is that it is done by an arbitrary deadline established by Congress that is nowhere to be found in the Northwest Power Act. Now, when Congress wanted to limit the allocation of benefits to the Federal-based system, they did it expressly. For example, in the case of the direct service industrial contracts to the aluminum industry, they said, we are going to grant you an initial term of a contract for 20 years. After that, you are on your own. They didn't impose such a time limit on the CFCT designation. But that's exactly, in our view, what Bonneville is trying to do through its tiered rate methodology. And this brings me to what I think is the crucial point of this case. This October 1, 2010 deadline is not directly tied to the availability of the CFCTs to the aluminum industry of this Federal-based system power in the future. In order to conclude that this is tied to the availability of power, you would have to conclude that on September 30, 2010, Bonneville had sufficient power to meet everybody's needs because they had committed to do that. But on the very next day, October 1, 2010, the deadline hits, sorry, no power for you at tier 1, no Federal-based system power for you. That's the problem that we have. And what's particularly frustrating to us, the utility and to the mill, is that we know that this Federal-based system power is available. We know that they're allocating 70 megawatts of Federal-based system power to serve another facility that's owned by the Federal government. We know that they are allocating 250 megawatts of Federal-based system power for hypothetical future preference customers that don't even exist yet and may never exist. The problem isn't that there's not enough Federal-based system power to go around to serve these CFCT loads, at least in substantial part. The problem is simply that Bonneville has decided to draw a line in the sand and say, we are not giving you any of that Federal-based system power anymore. And the reason that Bonneville is doing that is because they have made their own policy decision that these CFCT, these future CFCT loads, are simply not ever going to come online. So they've decided to supplant the statutory protections drafted by Congress in the Act with their own policy determination. So, in our view, this is an impermissible exercise of BPA's authority. BPA has made its motives clear in the past, and I think it's important in the past, where it has expressly stated, admitted that it wanted to, quote, administratively close out the class of future CFCT loads. Now, it conceded at the time that it did not have the authority. It would be completely impermissible just to cut them off and say, we're not giving you any power. So it came up with the TRM, and it said, okay, we'll serve you power in the future. We won't cut you off. We think that is completely inconsistent with the statutory protections that Congress sought to preserve for the forest products industry. So at the end of the day, the remedy that CLASC and I is seeking is a remand of the tiered rate methodology to Bonneville with specific instructions that this provision of the TRM, it's section 4.1.1.1, that it's contrary to the Northwest Power Act, and that any future CFCT loads that come online are entitled to service at the FBS, with FBS power, which is at the tier 1 rate, particularly to the extent that this FBS power is still available to provide this service. So unless you have any questions for me, I'd invite Mr. Brookhiser up to speak. Thank you. May it please the Court. My name is Donald Brookhiser, and I'm representing Intervenor Georgia Pacific. The panel granted us five additional minutes to discuss my motion to intervene, and so let me address that first. Georgia Pacific, its mill, which is served by CLASC and I Public Utility District, is the subject, or the beneficiary, of the contracted for, committed to designation that Bonneville granted to CLASC and I. So even though we see you What you're saying is we're entitled to this hunk of power, even though up to this point we've never utilized it. That's correct. And it's a taking, if you take that away from us. That's exactly right. We have, just like every other industry that had a CFCT designation, we have the right to exercise that when we want to expand the plant. Until we do, Bonneville has no obligation to actually deliver power. There's no load there. But when we build the machine, when we build the machine, it goes online. Then just like every other industry with CFCT designation, we have the right to have that served at Tier 1 rather than at Tier 2. As Mr. Lorenz said, that's a significant economic impact. Tier 2 is the cost that Bonneville incurs to go to the market and acquire new resources. Compared to the existing dam system on the Columbia River and the other resources that Bonneville has acquired since probably the 1930s, the cost of those new resources is significantly greater. And that gets to sort of the basis, I think, of the congressional intent. All existing load is served by a melded rate that incorporates all the costs of this portfolio of resources. The Tier 2 rate is not going to reflect any of the costs of existing resources acquired over time. It's going to reflect the cost of acquiring the new resources in the market, which is a significantly different cost. Unless the panel has any other questions about our intervention, let me just say that although nominally the CFCT designation went to Klatskanai, it is exclusively designated for our plant. We're the only industry, the only facility, that could use it. And so however BPA treats CFCT load, it impacts us directly. And any decision by this Court will impact us directly. As Judge Fletcher indicated, we are claiming a takings of a property interest, that we have an expectation and, in fact, a contractual right in our contract with Klatskanai to exercise up to 126 megawatts of power and take delivery of it. So we have a contractual right that's being interfered with by BPA's action. And there's extensive argument about this in the brief, and I won't repeat it, but I think it's essential to recognize that the interference with our contractual right was essential, was an essential part of BPA's implementation of its tiered rates. It's not incidental. It's not consequential. They could not have created the tiered rates methodology and cut off rights as of 2010 unless they dealt with CFCT as they have, unless they terminated the rights of CFCT to that first tier. Unless you have any further questions, that concludes my argument. Thank you. Good morning. May it please the Court, my name is Courtney Olive, and I'm representing Respondent Bonneville Power Administration. Your Honors, the Court's previous decision in industrial customers entirely controls this case. In that case, the Court found it was undisputed that the tiered rates methodology was a final action. And therefore, the Court reviewed it for the only merits-based claim the petitioners had brought, and the remainder of the claims, the Court found, were not ripe and would not be ripe until Bonneville had set rates and the Federal Energy Regulatory Commission had confirmed and approved those rates. That still has not happened. Therefore, the only remaining claims of these petitioners are still not ripe, and there's nothing for the Court to decide in this case. I'll spend the bulk of my time elaborating on these jurisdictional issues, and then I'll touch on the merits of this case, and certainly I'm open to tiered rates methodology as a final action. Klatske and I, in their briefs in industrial customers, said the tiered rates methodology is a final action. The only thing that they're using in this case to suggest that something has changed and that there's some new jurisdictional hook here is a declaratory order that the Federal Energy Regulatory Commission issued. Now, I think the clearest evidence that that declaratory order does not affect this Court's jurisdiction is what Klatske and I itself told the Court in that previous litigation. And I would strongly urge the Court to review and listen to the argument there. There you'll hear counsel for Klatske and I, Mr. Lorenz, said, or excuse me, that Bonneville had submitted to FERC the methodology for, voluntarily submitted it for this declaratory order and for FERC to look it over. Mr. Lorenz argued, was that fact jurisdictionally significant? And his answer to that was no, it was not. Your colleagues on the prior panel were aware that FERC was not significant to whether or not their jurisdiction vested. Their jurisdiction was present in the prior case. They reviewed the tiered rates methodology on the exact same claims that are being brought before you today, and they found that only one of those claims went to the actual merits of the methodology itself, and they denied that claim. The remainder of the claims were unripe, and they were unripe because FERC had not granted confirmation and approval. That confirmation and approval still has not happened. And I want to make sure the Court is aware, BPA has now set rates under the tiered rate methodology. We did that last summer, and we've submitted those rates to FERC for the formal confirmation and approval process. They're still pending there at FERC in that process. And in fact, Klatsk and I has already filed a petition with this Court that is pending with this Court and has been stayed until those rates are confirmed and approved by FERC. So it's that petition where they may have the opportunity to bring these claims, and they can then at least they'll be past the hurdle of FERC having confirmed and approved the rates. So this is certainly not the case for the Court to review that. With regard to any suggestion that their claims are different now or somehow nuanced and they really are going at the heart of the methodology, well, the time for them to raise those claims was in the first version of this case. And to the extent that they're now saying, well, what we really meant was, or we want another bite at the apple here, res judicata absolutely bars relitigation of that. This Court's blackletter case law in Tahoe Sierra, which we've cited in our brief, is quite clear. I'll just quote one sentence in particular. Res judicata bars relitigation of all grounds of So they're simply barred from attacking the tiered rates methodology yet again. With regard to the merits, just briefly, there were a number, a number of misconceptions and misstatements in the petitioner's arguments here. First, what Bonneville has done here is set two preference rates, PF rates. We are not denying anyone access to Federal power. They're still getting Federal power under these preference rates. And our statutes are quite clear. They speak in terms of rate or rates, plural, that BPA has complete authority to set more than one preference rate. And that's all we've done here. What these petitioners are arguing about is that they have some sort of superior protection, a price protection, that they should not be subjected to the second tier of preference rates. But the statutes clearly allow that. It's Section 7B1 of the Northwest Power Act that allows us to do that. And we've walked through it in great detail in our brief. So I don't know that I'll elaborate too deeply on that unless the Court has questions. Lastly, with regard to Georgia Pacific's constitutional takings claims, we believe that their motion to intervene should be denied. It was extremely untimely. It appears that Georgia Pacific waited until our motion to dismiss this case was denied. And after that, Georgia Pacific filed its motion to intervene. And Georgia Pacific even says in that motion to intervene they regarded the Court's decision in industrial customers as telling them to wait, telling them that these claims were not ripe until rates had been set and confirmed and approved by FERC. So it appears Georgia Pacific takes the same position on this ripeness issue as we do, as Bonneville does. I think that's it. One last just misconception that I want to clear up from Petitioner for Klatske and I and Mr. Lorenz's statements. There are not four customer classes that Bonneville has. There are only three. This Court has 30-plus years of case law that I think the case in paper industry is mentioned nowhere in there. They are not a separate class. They do not have this special superprotection to a specific rate as they're contending or, excuse me, a specific rate tied to specific low-cost resources as they're contending that they do. I'm available for any questions if the Court has them. Thank you. Thank you, Your Honor. So I'll keep my reply comments brief. BPA is urging you to find that the case is not ripe yet based on the prior decision of this Court. BPA is asking you to ignore multiple cases in which this circuit has found that a Petitioner may seek review of a BPA methodology once it has been approved by FERC and not before. That was the case in the ICNHU case that was previously decided. What we're here now with is the case where we have a methodology. FERC has approved it. It's ripe for review. They haven't addressed those cases. There are many of them. They're in our brief. The second thing is, where is this protection found, this fourth class of customers? The forest products industries, the CFCT loads, they're not direct customers of Bonneville. And if I implied that, I didn't mean to. They are customers of preference customers. Preference customers buy from Bonneville. They pass the power on to their retail loads. That explains that. So if there are any other questions, I'd be glad to answer. Otherwise, Mr. Brookhiser would like one more chance to speak. Thank you. I just wanted to respond to Mr. Olive's argument regarding the timeliness of our motion to intervene. As we state in the motion, we thought we were bound by the order of the prior panel and that an appeal was not ripe until final rates were approved by FERC. If this Court, if this panel finds that, in fact, this appeal is ripe, then, as I indicated before, our interests are clearly affected, and there is just cause for waiver of the rule and for our motion to intervene to be granted. There is no prejudice to any party by having our intervention occur later than allowed by the rule. And so if this panel is going to proceed with this substance, please grant our motion to intervene on the late-filed basis. Thank you. Thank you. This matter is submitted, and we'll recess until 9 a.m. tomorrow morning.
judges: Walter, Fletcher, Pregerson